NOT YET SCHEDULED FOR ORAL ARGUMENT

———————————

No. 17-7155

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

D.C. ASSOCIATION OF CHARTERED PUBLIC SCHOOLS, *et al.*,
APPELLANTS,

v.

DISTRICT OF COLUMBIA, *et al.*,
APPELLEES.

———————————

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————

**BRIEF FOR APPELLEES DISTRICT OF COLUMBIA, MURIEL
BOWSER, AND JEFFREY DEWITT**

———————————

KARL A. RACINE
Attorney General for the District of Columbia

LOREN L. ALIKHAN
Solicitor General

CAROLINE S. VAN ZILE
Deputy Solicitor General

JASON LEDERSTEIN
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 630 South
Washington, D.C. 20001
(202) 724-5671
jason.lederstein@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.    *Parties and amici.*—The appellants here are D.C. Association of Chartered Public Schools, Eagle Academy Public Charter School, and Washington Latin Public Charter School, who were also the plaintiffs below.  The defendants were the District of Columbia, then-Mayor Vincent C. Gray in his official capacity, and Jeffrey S. DeWitt, in his official capacity as Chief Financial Officer of the District of Columbia.  On appeal, the appellees are the same, except that Muriel S. Bowser, in her official capacity as Mayor of the District of Columbia, replaces the former Mayor as a party.  *Amici curiae* who have noticed their intent to participate are: (1) Council of the District of Columbia; (2) Washington Lawyers Committee for Civil Rights and Urban Affairs; (3) Senior High Alliance of Parent, Principals, and Educators (S.H.A.P.P.E.); (4) Mary Filardo; (5) Matthew Frumin; (6) Terry Goings; (7) Ron Hampton; (8) Cathy Reilly; (9) Victor Reinoso; (10) Eboni-Rose Thompson; (11) Martin Welles; (12) Suzanne Wells; (13) The 21st Century School Fund; (14) Nancy Sarah Smith; (15) Faith Swords; (16) Washington Teachers' Union Local #6, American Federation of Teachers; (17) Mark Simon; (18) Iris Jacob; (19) Brian Doyle; (20) Rebecca Reina; (21) Tina L. Fletcher; (22) Thomas Byrd; (23) Michael Grier.

B. *Ruling under review*.—The appellants appealed from a September 30, 2015 Memorandum Opinion and Order (Chutkan, T.) that dismissed one count in their complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and from a September 30, 2017 Memorandum Opinion and Order (Chutkan, T.) granting the defendants' cross-motion for summary judgment on the remaining counts.

C. *Related cases*.—Undersigned counsel are not aware of any related cases.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT .........................................................................1

STATEMENT OF THE ISSUES...........................................................................1

STATEMENT OF THE CASE...............................................................................2

      1.    District Of Columbia Home Rule. ...........................................2

      2.    Relevant Federal And District Law......................................5

            A.    The School Reform Act. ............................................5

                1.    Subtitle D: "Annual Budgets for Schools."....................8

                2.    Subtitle E: "School Facilities Repair and Improvement." ..............................................11

            B.    Teachers' retirement benefits...................................12

            C.    The Uniform Per Student Funding Formula Act. ....................13

      3.    School Funding Practices At The Time Of This Litigation. ...............15

            A.    Formula payments...................................................15

            B.    Non-formula payments to both sectors. ...................18

      4.    The Instant Suit. ................................................20

STANDARD OF REVIEW ...................................................................................23

SUMMARY OF ARGUMENT ..............................................................................23

ARGUMENT .........................................................................................................26

      I.    The District's Education Spending Is Consistent With The School Reform Act...............................................26

A. The funding formula does not apply to expenditures for specific needs arising outside of the annual budget allocation. ..................................................................26

B. Congress intended for facilities assistance, as well as retirement benefits, to be treated separately from the funding formula..........................................................33

    1. Congress specifically addressed facilities expenses outside of subtitle D.........................................................33

    2. The School Reform Act did not repeal existing laws on retirement benefits for teachers, or even require charter schools to have a retirement plan. ......................39

C. Congress ultimately left the District with discretion to determine the educational costs that are "operating expenses" covered by the formula. ............................................42

II. The Charter Schools Lack Standing To Challenge The District's Methodology For Calculating Enrollment And, In Any Event, It Comports With The School Reform Act..............................................46

A. The Charter Schools lack standing to pursue their claim. ........46

B. The School Reform Act permits the District's dual methodology for calculating enrollment...................................49

III. The Home Rule Act Allows The District To Amend Federal Law Enacted Exclusively To Govern It, Unless Congress Says Otherwise.........................................................................50

CONCLUSION ........................................................................55

# TABLE OF AUTHORITIES*

## *Cases*

*Berkeley Cty. Sch. Dist. v. S.C. Dep't of Revenue*, 679 S.E.2d 913 (S.C. 2009) ...................................................................................................................45

*\*Bliley v. Kelly, 23 F.3d 507* (D.C. Cir. 1994) .......................................................32

*\*Brooks v. Dewar*, 313 U.S. 354 (1941)...................................................................42

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) .............................................................................................................32

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984) ..................43

*Council of the District of Columbia v. Gray*, 42 F.Supp.3d 134 (D.D.C. 2014), *vacated and remanded*, 2015 WL 3450417 (D.C. Cir. 2015) ...................................4

*Dandridge v. Williams*, 390 U.S. 471 (1970) .........................................................43

*Deepenbrook v. Pension Benefit Guar. Corp*, 778 F.3d 166 (D.C. Cir. 2015) .......23

*District of Columbia v. John R. Thompson Co., Inc.*, 346 U.S. 100 (1953).............2

*Flippo v. Real Estate Comm'n of the District of Columbia*, 223 A.2d 268 (D.C. 1966) ........................................................................................................................3

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13 (D.C. Cir. 2006) ......................................................................................................................38

*Girouard v. United States*, 328 U.S. 61 (1946) ......................................................32

*Grand Canyon Airtour Coal. v. FAA*, 154 F.3d 455 (D.C. Cir. 1998) ...................43

*\*Kingman Park Civic Association v. Bowser*, 815 F.3d 36 (D.C. Cir. 2016) .........52

*Levenstein v. Salafsky*, 414 F.3d 767 (7th Cir. 2005) ............................................45

---

*          Authorities upon which we chiefly rely are marked with asterisks.

*Long v. Franklin Cmty. Sch. Corp*, 2010 WL 3781350 (S.D. Ind. Sept. 21, 2010) ..................................................................................................45

*Louisiana Public Service Commission v. FCC*, 476 U.S. 355 (1986)....................44

*\*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................46

*Martinez v. Bynum*, 461 U.S. 321 (1983) ................................................................44

*Megginson v. Pritzker*, 775 F.3d 430 (D.C. Cir. 2015) ..........................................40

*Nat'l Labor Relations Bd. v. SW General, Inc.*, 137 S. Ct. 929 (2017)..................36

*Renaissance Acad. For Math and Sci. of Mo., Inc., v. Imagine Schs., Inc.* 2014 WL 3828558 (U.S. Dist. Ct. W.D. Miss. Aug. 2, 2014).........................................45

*Thomas Jefferson Classical Acad. Charter Sch. V. Cleveland Cty. Bd. of Educ.*, 778 S.E.2d 295 (N.C. Ct. App. 2015)..........................................................45

*United States v. Hansen*, 772 F.2d 940 (D.C. Cir. 1985) .......................................54

*Wis. Dep't of Health and Family Servs. V. Blumer*, 534 U.S. 473 (2002) ..............43

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 17......................................................................................2

U.S. Const. art. VI, cl. 2...........................................................................................21

## Statutes and Regulations

31 U.S.C. § 1341 ........................................................................................................4

D.C. Code § 1-204.42 ..............................................................................................49

D.C. Code § 1-204.46 ....................................................................................... 16, 48-49

D.C. Code § 1-903.02 ..............................................................................................13

D.C. Code § 1-905.01 ..............................................................................................13

D.C. Code § 1-905.02 ..............................................................................................13

D.C. Code § 1-907.02 ...................................................................13

D.C. Code § 10-551.02(1) ............................................................33

D.C. Code § 38-1802.04(c)(3) ......................................................18

D.C. Code § 38-1802.04(c)(16) ....................................................18

D.C. Code § 38-1802.06(b) ..........................................................18

D.C. Code § 38-1802.06(c) ..........................................................18

D.C. Code § 38-1802.06(f) ...........................................................17

D.C. Code § 38-1804.01(b)(3) ......................................................18

D.C. Code § 38-1804.02 ...............................................................16

D.C. Code § 38-1804.02(a) ..........................................................17

D.C. Code § 38-1804.02(b) ..........................................................17

D.C. Code § 38-1804.02(d) ..........................................................17

D.C. Code § 38-1804.03 ...............................................................16

D.C. Code § 38-1804.03 (2016 Supp.) ........................................17

D.C. Code § 38-2902(b) ...............................................................46

D.C. Code § 38-2903 (2016 Supp.) .............................................14

D.C. Code § 38-2904 (2016 Supp.) .............................................14

D.C. Code § 38-2905 (2016 Supp.) .............................................14

D.C. Code § 38-2905.01 (2016 Supp.) ........................................14

D.C. Code § 38-2906.02(a) (2016 Supp.) ...................................17

D.C. Code § 38-2906.02(b)(1) (2016 Supp.) ..............................17

D.C. Code § 38-2906.02(b)(2) (2016 Supp.) ........................................................17

D.C. Code § 38-2906.02(b)(3) (2016 Supp.) ........................................................17

D.C. Code § 38-2906.02(b)(4) (2016 Supp.) ........................................................17

D.C. Code § 38-2906.02(c) (2016 Supp.) ...........................................................17

D.C. Code § 38-2906(a) ....................................................................... 15-16

D.C. Code § 38-2906(d) ...........................................................................15

D.C. Code § 38-2908(b-1) (2016 Supp.) .............................................................20

D.C. Code § 38-2908(b-2) (2016 Supp.) .............................................................20

D.C. Code § 38-2908(b-2)(1) (2016 Supp.) ......................................................15, 36

D.C. Code §47-355.02 ...........................................................................48

District of Columbia School Reform Act of 1995, Pub. L. 104-134, 110 Stat. 1321-107 (Apr. 26, 1996) ("School Reform Act") ......................................... 1, 5-6

School Reform Act:

§ 2002 ......................................................................................8, 42

§ 2002(11) ...............................................................................13, 40

§ 2201 ........................................................................................7

§ 2201(b) .....................................................................................7

§ 2202 ........................................................................................7

§ 2203(i) ..................................................................................7, 29

§ 2204 ........................................................................................7

§ 2207 ........................................................................................7

§ 2207(b)(2) .............................................................................13, 40

§ 2207(b)(2)(c) ..................................................................................40

§ 2207(b)(3) .................................................................................13, 40

§ 2207(b)(5) ..................................................................................13

§ 2401 .....................................................................................7-8

§ 2401(a) ...................................................................................27

§ 2401(b) ...................................................................................13

§ 2401(b)(1) .................................................................................44

§ 2401(b)(1)(A) .............................................................................8, 27

§ 2401(b)(1)(B) .............................................................................8, 27

§ 2401(b)(2) .................................................................................44

§ 2401(b)(2)(A) ................................................................................8

§ 2401(b)(2)(B) ................................................................................8

§ 2401(b)(3)(A) ...............................................................................14

§ 2401(b)(3)(A)(ii) .............................................................................8

§ 2401(b)(3)(B) ...............................................................................14

§ 2401(b)(3)(B)(i) ..............................................................................9

§ 2401(b)(3)(B)(ii) .............................................................................9

§ 2402 ........................................................................................8

§ 2402(a)(1) ...................................................................................9

§ 2402(a)(2) ..................................................................................10

§ 2402(b) ...................................................................................9, 49

§ 2402(c) ............................................................................................ 9

§ 2402(d)(2)(B) ................................................................................ 9

§ 2402(d)(2)(B)(i) .......................................................................... 50

§ 2402(d)(3) ...................................................................................... 9

§ 2403 ................................................................................................ 8

§ 2403(a)(2)(A) ................................................................................ 9

§ 2403(a)(2)(B) .............................................................................. 50

§ 2403(a)(2)(B)(ii) ........................................................................ 10

§ 2550(1) ........................................................................................ 11

§ 2550(2) ........................................................................................ 11

§ 2551(a) .................................................................................. 11, 35

§ 2551(b) .................................................................................. 11, 35

§ 2551(c)(4) .................................................................................... 11

§ 2552 .............................................................................................. 35

§ 2552(a) ........................................................................................ 11

§ 2552(b) ........................................................................................ 11

Council Res. 11-441 (July 3, 1996) ............................................ 14

D.C. Law 11-135, 43 D.C. Reg. 1699 (Apr. 5, 1996) ................ 6

D.C. Law 15-348, 52 D.C. Reg. 1991 (June 10, 2005) ............ 10

D.C. Law 18-370, 58 D.C. Reg. 108 (May 3, 2011) ................ 18

D.C. Law 19-9, 58 D.C. Reg. 6249 (July 29, 2011) ................ 19

D.C. Law 19-168, 59 D.C. Reg. 8079 ....................................19

D.C. Law 20-14, 60 D.C. Reg. 9554 (June 18, 2013) ............................18

D.C. Law 20-61, 60 D.C. Reg. 12511 (Sept. 6, 2013)............................19

District of Columbia Appropriations Act, 1997, Pub. L. 104-194, 110 Stat. 2356.......................................................................................13, 36, 41

District of Columbia Appropriations Act, 1998, Pub. L. 105-100, 111 Stat. 2160........................................................................ 12-13, 36, 42

Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L 105-277, 112 Stat. 2681 ....................................42

District of Columbia Appropriations Act, 2001, Pub. L. 106-522, 114 Stat. 2440 ...........................................................................5, 10, 42, 52

District of Columbia Appropriations Act, 2002, Pub. L. 107-96, 115 Stat. 923 ........................................................................................10

Consolidated Appropriations Resolution, 2003, Pub. L. 108-7, 117 Stat. 11 (Feb. 20, 2003) .........................................................................10

Consolidated Appropriations Act, 2004, Pub. L. 108-199, 118 Stat. 3 ..................10

District of Columbia Appropriations Act, 2005, Pub. L. 108-335, 118 Stat. 1322.......................................................................................10

Omnibus Appropriations Act, 2009, Pub. L. 111-8, 123 Stat. 524 .........................39

District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub. L. 104-8, 109 Stat. 97 .........................................29 , 51

District of Columbia Retirement Reform Act of 1979, Pub. L. 96-122, 93 Stat. 866 (Nov. 17, 1979) .....................................................................12, 39

District of Columbia Retirement Protection Act of 1997, Pub. L. 105-33, 111 Stat. 251 (Aug. 5, 1997).................................................................. 12-13

Fiscal Year 2012 Budget Request Act of 2012, D.C. Act 19-381, 59 D.C. Reg. 7338 .......................................................................................4

xi

Fiscal Year 2012 Second Revised Budget Request Temporary Adjustment Act of 2012, D.C. Act. 19-396, 59 D.C. Reg. 8705 (July 27, 2012) ........................19, 32

Home Rule Act, Pub. L. 93-198, 87 Stat. 774 (Dec. 24, 1973) ................................3

Home Rule Act:

§ 102(a) ....................................................................................................3, 54

§ 302(a) ................................................................................................3, 51, 53

§ 401(a) ...........................................................................................................3

§ 404(a) ................................................................................................3, 51, 53

§ 442(a)(1) .......................................................................................................4

§ 446 ............................................................................................................ 3-4

§ 601 ........................................................................................................5, 52

§ 602(a)(3) ............................................................................................ 3, 51-53

§ 602(c)(1) ...............................................................................................3, 51

§ 603(e) ...........................................................................................................4

§ 717(a) ........................................................................................................53

§ 717(b) .................................................................................................... 52-53

§ 717(c) ........................................................................................................53

Public Education Reform Amendment Act of 2007, D.C. Law 17-9, 54 D.C. Reg. 4099 (July 6, 2007) ..................................................................................6

Pub. L. 102-11, 105 Stat. 33 ....................................................................51

Uniform Per Student Funding Formula for Public Schools and Public Charter Schools and Tax Conformity Clarification Amendment Act of 1998 ("UPSFF Act") ..................................................................................................................14

UPSFF Act:

§ 102(5) ..................................................................................14

§ 103(b) ..................................................................................15

§ 104 .......................................................................................14

§ 105(a) ..................................................................................14

§ 106 .......................................................................................14

§ 109 .......................................................................................15

§ 112(a) ..................................................................................14

## *Legislative History*

H.R. Rep. No. 104-455 (1996) (Conf. Rep.) ..... 5-7, 9, 11, 28, 31, 34, 37, 41, 44, 48

H.R. Rep. No. 104-689 (1996), 1996 WL 413198 ....................................36, 39, 42

H.R. Rep. No. 108-214 (2003)...........................................................................39

S. Rep. No. 104-144 (1995) ...........................................................................5, 8

141 Cong. Rec. 11721....................................................................................9, 30

141 Cong. Rec. 11722..................................................................................11, 34

Testimony of Karen Shook, Senate Appropriations Subcommittee on the District of the Columbia, 1996 WL 353916 ...........................................................31

D.C. Council Committee on Education and Libraries, Report on Bill No. 11-318, the "Public Charter Schools Act of 1995" .................................. 6-7, 28, 30, 41

## *Other*

Fiscal Year 2013 Operating Budget Chapters and Operating Appendix Tables and Capital Budgets by Agency, http://cfo.dc.gov/node/290752 (last visited Sept. 4, 2018) ...........................................................................................4

Fiscal Year 2013 Operating Budget Chapters and Operating Appendix Tables and Capital Budgets by Agency, https://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/ocfo_fy2013_volume_2_chapters_part_1.pdf (last visited Sept. 6, 2018) ...................................................................38

# GLOSSARY

| | |
|---|---|
| DCPS | District of Columbia Public Schools |
| DGS | District of Columbia Department of General Services |
| FRMMA | District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub. L. 104-8, 109 Stat. 97. |
| GSA | United States General Services Administration |
| HRA | Home Rule Act, Pub. L. No. 93-198, 87 Stat. 774 (1973). |
| JA | Joint Appendix |
| OSSE | Office of the State Superintendent |
| SRA | District of Columbia School Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321-107 (Apr. 26, 1996). |
| UPSFF Act | Uniform Per Student Funding Formula for Public Schools and Public Charter Schools and Tax Conformity Clarification Amendment Act of 1998, D.C. Law 12-207, 45 D.C. Reg. 8095 (Nov. 20, 1998). |

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Appellants, the D.C. Association of Chartered Public Schools, Eagle Academy Public Charter School, and Washington Latin Public Charter School (collectively, the "Charter Schools") challenge the legality of certain funding the District of Columbia provides solely to traditional public schools.  They claim that under the District of Columbia School Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321-107 (Apr. 26, 1996) ("School Reform Act"), any District monies spent on the operating costs of public education must be distributed to both educational sectors equally, pro-rated by the number of students actually enrolled in each system.  The issues are:

1.   Whether the Council of the District of Columbia may direct supplemental funds to either traditional public schools or charter schools to address specific needs outside of the yearly budget process, when Congress required only that both systems receive an up-front annual budget allocation from District funds to cover their anticipated operating costs;

2.   Whether Congress required that the annual budget allocation for operating expenses include local funds spent on repair and management of traditional public

school facilities, as well as retirement benefits for teachers in that system, when the School Reform Act treated facilities for both sectors separately from the funding formula, did not require charter schools to even have retirement plans, made no changes to the existing system for funding retirement benefits for DCPS teachers outside of the operating budgets for the public schools, and otherwise left "operating expenses" out of the definitional section it enacted;

3. Whether the Charter Schools have standing to challenge the use of projected numbers for calculating enrollment in traditional public schools as part of the annual budget allocation, when they do not claim that the method used to calculate their enrollment was improper and they do not show that they suffered any resulting loss of funds or other injury.

4. Whether any departure from the School Reform act is actionable when Congress granted the District the authority to amend or repeal congressional legislation that applies exclusively to it.

## STATEMENT OF THE CASE

**1.    District Of Columbia Home Rule.**

The Constitution grants Congress plenary power to legislate for the District. U.S. Const. art. I, § 8, cl. 17. Congress, in turn, may delegate any or all of this power to the District government. *District of Columbia v. John R. Thompson Co., Inc*., 346 U.S. 100, 108-10 (1953).  In 1973, Congress did just that, after having legislated for

2

the District for roughly 100 years.  *See* Home Rule Act ("HRA"), Pub. L. No. 93-198, 87 Stat. 774 (1973), codified as amended in D.C. Code § 1-201.01 *et seq.*; *Filippo v. Real Estate Comm'n of D.C.*, 223 A.2d 268, 270 (D.C. 1966).  Through the Home Rule Act, Congress aimed to "grant the inhabitants of the [District] powers of local self-government," "to delegate certain legislative powers to the [District] . . . and, to the greatest extent possible, . . . relieve Congress of the burden of legislating upon essentially local District matters."  HRA § 102(a).  Thus, the Act, and particularly the "District Charter" within the Act, established a locally elected Council, and delegated to it sweeping power to enact laws on "all rightful subjects of legislation."  HRA §§ 302, 401(a), 404(a).  This included authority for the Council to "amend or repeal any Act of Congress . . . restricted in its application exclusively in or to the District."  HRA § 602(a)(3).

Congress, however, retained residual authority over the District in several ways.  For example, the Home Rule Act directed that ordinary legislation enacted by the Council would not become effective until it passed through a 30-day congressional review period without veto by both houses of Congress.   HRA § 602(c)(1).

Additionally, the Home Rule Act prohibited the District from spending locally derived revenue unless it was first appropriated by Congress.  HRA § 446.  This appropriations process was a vehicle for substantial congressional oversight of

District affairs.  The Home Rule Act requires that the Mayor submit a detailed budget request to the Council that specifies the agencies and purposes for which funds are being requested, for ultimate submission to Congress.   HRA §§ 442(a)(1), 446.  Thus, each year, the Mayor proposes to the Council a Budget and Financial Plan ("Budget Plan") covering all District functions and, upon its enactment with any modifications, it is transmitted through the President to Congress along with a "Budget Request Act" that incorporates the Budget Plan as part of the total amount of funds to be appropriated.  *See, e.g.*, Fiscal Year 2013 Budget Request Act of 2012, D.C. Act 19-381, 59 D.C. Reg. 7388, 7391 (June 22, 2012) (referencing the "Budget Plan"); Fiscal Year 2013 Operating Budget Chapters and Operating Appendix Tables and Capital Budgets by Agency, http://cfo.dc.gov/node/290752 (last visited Sept. 6, 2018); Joint Appendix ("JA") 237-50, 827 ¶ 11.  After Congress approves the District's proposed budget in an appropriations act (with or without modifications), the District may not "expend[]" or "obligate[]" any monies in amounts or for purposes not otherwise approved.   HRA § 446; *see id*. § 603(e) (incorporating the Anti-Deficiency Act, now codified at 31 U.S.C. § 1341, into the Home Rule Act).[1]  Moreover, Congress frequently uses the appropriations process

---

[1]      Legislative efforts concerning the District's budget autonomy are not relevant to the time period in this case and are thus not at issue. *See Council of D.C. v. Gray*, 42 F.Supp.3d 134 (D.D.C. 2014), *vacated and remanded*, 2015 WL 3450417 (D.C. Cir. 2015).

4

to enact riders that further restrict expenditures by the District, or that nullify District laws. *See, e.g.*, D.C. Appropriations Act, 2001, Pub. L. 106-522, § 124, 114 Stat. 2440, 2464 (prohibiting use of funds by the District to implement or enforce a health care benefits expansion law passed by the Council concerning domestic partners); *id.* at § 143(b), 114 Stat. 2471 ("The Legalization of Marijuana for Medical Treatment Initiative of 1998 . . . shall not take effect").

Finally, Congress retains the right "to exercise its constitutional authority as legislature for the District" at any time, because it has the ability to "enact[] legislation for the District on any subject . . . including legislation to amend or repeal . . . any act passed by the Council." HRA § 601.

## 2.    Relevant Federal And District Law.

### A.    The School Reform Act.

In 1996, Congress passed the School Reform Act, which was codified as amended in D.C. Code § 38-1800.01, *et seq.* The legislation was an effort to address local outcry over the state of public education in the District, including poor student performance, bureaucratic in-fighting, and the deterioration of public school buildings—of which "62% were over 45 years-old, but only 8 of the 163 operating schools ha[d] ever had total renovations." H.R. Rep. No. 104-455, at 141-42 (1996) (Conf. Rep.); S. Rep. No. 104-144, at 7 (1995). Congress determined to create a "local structure" for education reforms by, for example, mandating that the

5

Superintendent of the District's school system design a long-term plan covering an array of topics. H.R. Rep. No. 104-455, at 143. Congress also included authorization for the creation of charter schools, which would receive public funds but would not be governed by the Board of Education. SRA §§ 2201-15.[2]

In authorizing the creation of charter schools, Congress borrowed heavily from reform efforts already underway in the District—and particularly in the Council, which was considering a bill approved by its education committee (and ultimately passed by the Council) to allow for the creation of public charter schools and to establish a student-driven funding formula that would follow the student. D.C. Council Committee on Education and Libraries, Report on Bill No. 11-318, the "Public Charter Schools Act of 1995," at 2 ("Council Comm. Rep."); H.R. Rep. No. 104-455, at 143 (referencing the Council's bill and committee action, as well as reform planning by the Superintendent); D.C Law 11-135, 43 D.C. Reg. 1699 (Apr. 5, 1996). The Council expected charter schools to offer students new and expanded choices for public education. Council Comm. Rep. at 2. It expected that the funding

---

[2]    In 2007, Congress approved the Public Education Reform Amendment Act of 2007, D.C. Law 17-9, 54 D.C. Reg. 4099 (July 6, 2007), which established a separate mayoral agency called the District of Columbia Public Schools ("DCPS"), and a new state-level education agency called the Office of the State Superintendent ("OSSE"). *See id.* §§ 102-103, 106, 202. Unless otherwise noted, the term "DCPS" references the public school system as run by either the former Board of Education or the Mayor.

formula would provide "predictability in forthcoming appropriations [which] would allow the school system (and public charter schools) to engage in substantive long-range planning." *Id*. at 15. The language in the School Reform Act on these issues, among others, was modeled on the District's bill. *Compare* SRA §§ 2201-02, 2204, 2207, 2401, *with* Council Comm. Rep. at 7-10, 14-16, 21-24, 33-34 (Committee Print).

The Council's efforts, however, were met with resistance by some in the District who feared that publicly funded charter schools would siphon money from neighboring public schools, thereby creating a "two-tiered" system of public education disfavoring the traditional school system. Council Comm. Rep. at 7-8, 14, 40. Similarly, critics expressed concerns that if then-existing private schools transformed into charter schools with their own student bodies, they would effectively "raid public coffers intended to support public education." *Id.* at 14. To avoid that scenario, the Council limited the total number of new charter schools to 10 per year. *Id*. at 36. In the School Reform Act, Congress was even more stringent, limiting new charter schools to only five per year beginning in 1997. *Compare* Council Comm. Rep. at 8, 14, *with* SRA §§ 2201(b), 2203(i).

Overall, Congress did not seek to end Home Rule for the District regarding public education, but rather to offer its assistance as a component of the District community. *See* H.R. Rep. No. 104-455 at 142 ("[The School Reform Act] goes a

long way toward creating the local structure to address the concerns expressed by the community."); S. Rep. No. 104-144, at 6 ("Needed changes in the D.C. Public School System will not be imposed from the Congress. Those changes must come from the local community, with every part, including the Congress, pitching in.").

Two subtitles of the School Reform Act are relevant to this case.

### 1.    Subtitle D: "Annual Budgets for Schools."

Subtitle D of the School Reform Act addressed the annual operating budgets for both traditional and charter schools. SRA §§ 2401-03. Under the heading "Annual Budgets for Schools," its first section provided:

> The Mayor and the District of Columbia Council, in consultation with the Board of Education and the Superintendent, shall establish . . . a formula to determine the amount of . . . the annual payment to the Board of Education for the operating expenses of [DCPS] . . . and … the annual payment to each public charter school for the operating expenses of each public charter school.

*Id.* § 2401(b)(1)(A)-(B). Although the Act contained a comprehensive definition section, it did not define "operating expenses." *Id.* § 2002.

Section 2401 further explained that "the amount of the annual payment [for operating expenses] . . . shall be calculated by multiplying a uniform dollar amount used in the formula . . . by . . . the number of students . . . that are enrolled at [DCPS] or . . . at each public charter school." *Id.* § 2401(b)(2)(A)-(B). The "dollar amount" was to be the cost of educating a student, or a "per pupil" figure, as determined by the Mayor and the Council. *See id.* § 2401(b)(3)(A)(ii) (permitting adjustment of

8

formula to take account of the costs of educating students in certain grade levels); H.R. Rep. No. 104-455, at 146 ("Such a formula will clarify and focus decisions regarding funding for public education around student needs"). In addition to adjusting the formula for different grades, the School Reform Act permitted the Mayor to increase payments related to students who had special needs or who did not meet minimum literacy standards. SRA § 2401(b)(3)(B)(i), (ii). This latter adjustment was Congress's attempt to allay fears that the creation of charter schools would leave disadvantaged students with a second-tier education within DCPS. 141 Cong. Rec. 11721.

With respect to calculating enrollment numbers each year, the School Reform Act required DCPS to calculate the numbers based on reporting from individual schools "no later than October 15." SRA § 2402(a)(1), (b). DCPS was also directed to arrange for an independent audit of the initial calculations, which would evaluate the "methodology" used to determine enrollment. *Id.* § 2402(d)(2)(B). The results of the initial calculations and the audit were to be publicly disseminated. *Id.* § 2402(c), (d)(3).

As for payments of formula funds, the School Reform Act addressed only charter schools. It required the Mayor to pay 75% of the annual figure to each charter school by October 15 of each year. *Id*. § 2403(a)(2)(A). The remaining amount was to be paid by the following May 1; however, a different scenario occurred if

9

enrollment numbers for the charter school changed during the school year. Under a

provision titled "SPECIAL RULE," Section 2402 required that each public charter

school submit a report of its enrollment "not later than April 1 of each year," *id.*

§ 2402(a)(2), in order "to ensure accurate payment" under a subsequent section that

stated:

> [I]f the enrollment number of a public charter school has changed from
> the number [previously] reported . . . the Mayor shall increase the
> payment in an amount equal to 50 percent of the amount provided for
> each student who has enrolled in such school in excess of such
> enrollment number, or shall reduce the payment in an amount equal to
> 50 percent of the amount provided to each student who has withdrawn
> or dropped out of such school below such enrollment number.

*Id.* § 2403(a)(2)(B)(ii). The School Reform Act did not call for a similar adjustment

for DCPS.

In 2000, Congress adjusted the payment frequency for charter schools by

establishing a quarterly schedule. *See* D.C. Appropriations Act, 2001, Pub. L. No.

106-522, 114 Stat. 2440, 2449. It then included the quarterly adjustment

requirement in the annual appropriations acts for each subsequent year until the

Council codified a quarterly payment structure in 2005 through statutory

amendments that went through the congressional review process. D.C. Law 15-348,

§§ 101(d), 102(b), 52 D.C. Reg. 1991 (June 10, 2005).[3]

---

[3]     Pub. L. No. 107-96, 115 Stat. 923, 935; Pub. L. No. 108-7, 117 Stat. 11, 116;
Pub. L. No. 108-199, 118 Stat. 3, 120-21; Pub. L. No. 108-335, 118 Stat. 1322, 1331.

10

2.    Subtitle E: "School Facilities Repair and Improvement."

The School Reform Act addressed Congress's concern about the physical condition of DCPS schools in a separate subtitle named "School Facilities Repair and Improvement." SRA §§ 2550-2571. "[R]epair and improvement," was defined to include "administration, construction, and renovation." *Id.* § 2550(1)-(2).

Under Subtitle E, Congress directed the United States General Services Administration ("GSA") to enter into an agreement with DCPS for GSA to provide technical assistance in a variety of forms concerning the "management" of DCPS facilities—mostly involving repair and improvement in accordance with an earlier "Master Plan" developed by the Superintendent that was estimated to cost upwards of $1.2 billion. *Id.* § 2551(a), (b); H.R. Rep. No. 104-455, at 142. At the same time, the School Reform Act required the Mayor and the Council to develop a revitalization program for the "repair and improvement, and management and maintenance" of DCPS facilities that would be administered by a designated agency within the District government, *id.* § 2552(a), and the Mayor and the Council were to identify short- and long-term funding for "capital and maintenance of facilities." *Id.* § 2552(b). To the extent the agency designation occurred while the agreement with GSA was ongoing, that agreement would terminate once the local agency assumed responsibility for DCPS facilities. *Id.* § 2551(c)(4); *see* 141 Cong. Rec. 11722 ("It is not the intent of .

11

. . Congress to take over the maintenance of the school system, but rather to become a partner with the school system to help repair and improve school facilities.").

The School Reform Act did not initially address funding for charter school facilities, but Congress amended the Act just over a year later to allow charter schools to obtain an increase in their annual payment "to take account of leases or purchases of, or improvements to real property," with such increase occurring outside the per-pupil formula. Section 171, D.C. Appropriations Act, 1998, Pub. L. 105-100, 111 Stat. 2160, 2191.

### B.    Teachers' retirement benefits.

At the time the School Reform Act was passed, retirement benefits for public school teachers were not part of DCPS's operating expenses, but rather went from the District's General Fund to the DCPS Teachers' Retirement Fund, which was managed by the D.C. Retirement Board. District of Columbia Retirement Reform Act of 1979, §§ 121, 123, 142(c), Pub. L. No. 96-122, 93 Stat. 866, 872-75 ("Retirement Act"). Congress established the DCPS Teachers' Retirement Fund in 1979 to cover a benefit structure created by Congress before the District obtained Home Rule. Retirement Act § 123; *see* District of Columbia Retirement Protection Act of 1997, § 11002(a)(10), Pub. L. No. 105-33, 111 Stat. 251, 715-16 ("Retirement Protection Act"). When the fund was created, payments for benefits were to be made from both federal and local dollars. Retirement Act § 144. Thus, up to fiscal year

12

1997, the annual appropriations legislation approved by Congress included both a "federal contribution" and an appropriation from local funds for payment into the retirement system, which was separate and distinct from the regular appropriations to DCPS, and later, to charter schools.  *See, e.g.*, D.C. Appropriations Act, 1997, Pub. L. No. 104-194, 110 Stat. 2356, 2359.  In July 1997, by direction of Congress, the District assumed sole responsibility for creating and funding a replacement retirement plan.  Retirement Protection Act § 11042; *see* D.C. Code §§ 1-903.02, 1-905.01 to 905.02, 1-907.02.   From that point, Congress approved a single appropriation from local funds for retirement benefits, again, apart from the public education formula funding.  *See, e.g.*, D.C. Appropriations Act, 1998, Pub. L. 105-100, 111 Stat. 2160, 2164.

The School Reform Act did not contain any language amending or modifying the District Retirement Act, although it authorized DCPS teachers who permanently moved to a charter school to remain in the retirement plan.  SRA § 2207(b)(3), (5); *see id.* § 2002(11).  In addition, the School Reform Act did not require charter schools to offer retirement benefits to its teachers.  *Id*. § 2207(b)(2).

### C.     The Uniform Per Student Funding Formula Act.

In September 1998, in accordance with Congress's directive to "establish a formula" to fund schools' operational expenses, SRA § 2401(b), the Council passed the Uniform Per Student Funding Formula for Public Schools and Public Charter

13

Schools and Tax Conformity Clarification Amendment Act of 1998, D.C. Law 12-207, 45 D.C. Reg. 8095 (Nov. 20, 1998) ("UPSFF Act"), codified at D.C. Code § 38-2901 *et seq.*[4]

The UPSFF Act established funding at a "foundation level" of $5,500 per student, which represented the amount needed to provide a pupil with "regular education services" not including "capital costs." *Id*. §§ 102(5), 104.[5]  The UPSFF Act then applied various "weightings" to the foundation level to take account of increased costs of education at various grade levels, such as a factor of "1.16" for pre-kindergarten students, making the per student allocation in that category $6,380. *Id*. § 105(a); *see* SRA § 2401(b)(3)(A).  The UPSFF Act also arranged for weightings for students who were receiving special education services, were "Limited and Non-English Proficient," or were attending summer school.  UPSFF Act § 106; *see* SRA § 2401(b)(3)(B).[6]

---

[4]     Because the School Reform Act required a funding formula to be in place for fiscal year 1997, the Council adopted an interim resolution to establish the formula until permanent legislation could be enacted.  Council Res. 11-441 (July 3, 1996).

[5]     The formula was to be revised periodically by the Council in consultation with DCPS and the charter schools and based on data including research and public comment.  UPSFF Act § 112(a).

[6]     The structure of this formula has remained unchanged, although additional weighting categories have been added.  *See, e.g.*, D.C. Code §§ 38-2903 to 2905, 2905.01 (2016 Supp.).  The foundation level as of Fiscal Year 2015 was $9,492 per student.  D.C. Code § 38-2903 (2016 Supp.).

The UPSFF Act also arranged for charter schools to receive a facilities allowance. Although the Act allocated the allowance on a per-student basis, it was calculated outside of the funding formula using data concerning facility costs within DCPS. UPSFF Act § 109. The Council later amended the facilities allowance provisions, settling on a general figure of $3,072 per student during the time of this case. D.C. Code § 38-2908(b-2)(1) (2016 Supp.).[7]

The UPSFF Act also clarified that the funding formula applied only to operating budget appropriations from the District's General Fund "for DCPS and for Public Charter Schools," and not to "funds appropriated to other agencies." UPSFF Act § 103(b). The UPSFF Act was passed as ordinary Council legislation and took effect following congressional review. JA 561.

### 3.  School Funding Practices At The Time Of This Litigation.

#### A.  Formula payments.

DCPS and each public charter school receive most of their resources from local funds paid through the formula, which in Fiscal Year 2014 amounted to a combined total of $1.3 billion. JA 787. The calculation of student enrollment begins with a projection of the number of students each school will serve in October of the appropriation year. *See* D.C. Code § 38-2906(a), (d). Each school submits an

---

[7]     In Fiscal Year 2014, for example, $114.2 million was allocated to charter schools. JA 802.

15

enrollment estimate in December of the preceding year to a projection team consisting of representatives from OSSE, the Deputy Mayor for Education, and the Office of the Chief Financial Officer for the District.  D.C. Code § 38-1804.02; JA 769.  The projection team adjusts the estimates based on factors such as historic student mobility and potential growth based on facility, program, or grade-level changes.  JA 769.

The annual formula appropriation for DCPS is paid as a lump sum through the normal budget process based on projected enrollment.  D.C. Code § 38-2906(a).  The appropriation is not adjusted based on differences between the projection and the ultimate, audited enrollment count.  *See id.* §§ 38-2906(a), 38-1804.03.  Instead, to the extent there is any over-projection, DCPS's operating budget is subject to having its excess funds moved to other agency budgets, D.C. Code § 1-204.46; likewise, the Anti-Deficiency Act prohibits DCPS from carrying over excess operating funds from year to year, so any remaining monies ordinarily revert to the District's General Fund unless directed elsewhere.  *Id.*; JA 826 ¶ 9.[8]

The practice is different for charter schools.  In addition to the projection team numbers, public chartering authorities (as well as DCPS) must report student enrollment figures on June 30, October 15, December 15, and March 30 of each

---

[8]     Public charter schools are not subject to these constraints once the formula amount is paid.  *See* JA 660.

16

year.  D.C. Code § 38-1804.02(a).  OSSE uses the first two reports to calculate

enrollment in each school (including DCPS schools) as of October 5, and then

provides for an independent audit of those calculations.  D.C. Code § 38-1804.02(b),

(d).  Public charter schools receive their annual formula appropriation as quarterly

payments in July, October, January, and April.  D.C. Code §§ 38-2906.02(a), 38-

1804.03 (2016 Supp.).  The July payment is based on the projected enrollment from

the June 30 quarterly report; the second two payments in October and January are

derived from the unaudited report of enrollment as of October 5; and the final April

payment is based on the audited data.  D.C. Code § 38-2906.02(b)(1)-(4) (2016

Supp.); JA 796.  Thus, if the audit identifies greater or fewer students enrolled in a

charter school as of October 5 than originally estimated or counted, the school's last

payment is adjusted accordingly.  D.C. Code. § 38-2906.02(c) (2016 Supp.).

As a result, the process of reconciling the UPSFF Act appropriation to the

audited enrollment figures for charter schools is based only on audited numbers for

October, and therefore does not account for student mobility after October.  That is

significant.  DCPS consists of more than 100 schools located across the District and

is a "system of right," meaning that it is required to admit all eligible students who

seek to enroll at any time, including students withdrawing from public charter

schools mid-year.  D.C. Code § 38-1802.06(f); JA 657, 661.  Public charter schools,

which vary in terms of size, may refuse to accept students beyond enrollment

17

ceilings they set.  JA 657; D.C. Code §§ 38-1802.04(c)(3), (16), 1802.06(b), (c).

Average public charter school enrollment generally decreases from October to June,

while enrollment in DCPS increases during the same period.  JA 817-18 ¶¶ 4, 7.  In

addition, enrollment of students receiving special education services and with other

special needs increases at DCPS schools after October each year.  JA 818-819 ¶¶ 5,

8.

### B.    Non-formula payments to both sectors.

Both DCPS and charter schools have benefitted from periodic supplemental

appropriations and financial incentives outside of the funding formula.  For example,

the Council amended the SRA to authorize supplemental funding for special

education services to all schools in Fiscal Year 2011.  D.C. Law 18-370, § 403(a),

58 D.C. Reg. 108 (May 3, 2011); D.C. Code § 38-1804.01(b)(3).  During Fiscal Year

2013, the District's revised budget request legislation likewise increased local

funding to both sectors by $2 million for summer school, with the funding to public

charter schools to be distributed "equally among local education agencies," rather

than through the UPSFF Act formula.  D.C. Law 20-14, § 2, 60 D.C. Reg. 9554

(June 18, 2013).

The  District  has  also  authorized  supplemental  appropriations  or

reprogrammed funds for DCPS to cover unexpected budgetary shortfalls.  JA 828

¶¶ 7-8.  In Fiscal Year 2012, the Council provided DCPS approximately $25 million

as part of a mid-year supplemental appropriation to account for cuts to federal grant funding, a food services contract, and other costs. *See* Fiscal Year 2012 Second Revised Budget Request Temporary Adjustment Act of 2012, § 2, D.C. Act 19-396, 59 D.C. Reg. 8705 (July 27, 2012). DCPS has not since received a similar supplemental appropriation; however, in Fiscal Year 2014, it was allocated $126,000 in reprogrammed funds for matters including translation services at certain schools. JA 826 ¶ 7.[9]

Individual public charter schools likewise benefit from supplemental non-UPSFF Act funding. From Fiscal Year 2011 to Fiscal Year 2014, the Council authorized non-formula earmarks to charter schools for various purposes. *See, e.g.*, D.C. Law 19-9, § 2023, 58 D.C. Reg. 6249 (July 29, 2011) (supplemental funding for "all costs associated with 24-hour vocational education programs"); D.C. Law 19-168, § 4082, 59 D.C. Reg. 8079 (July 6, 2012) (grant funding of up to $500,000 for public charter schools co-located with DCPS schools that must relocate due to DCPS building renovations); D.C. Law 20-61, § 4092, 60 D.C. Reg. 12511 (Sept. 6, 2013) (authorizing a "capital grant of $6 million for facility construction of a language-immersion public charter school").

---

[9]   For Fiscal Years 2013 and 2015, DCPS's expenditures were less than its annual operating budget, so extra funds either lapsed to the General Fund or were reprogrammed. JA 826 ¶¶ 8-9.

While DCPS and individual public charter schools benefit from services provided by other District government agencies, some are provided to DCPS only, such as utilities, repairs, improvements, and some maintenance functions, which are managed by the District's Department of General Services ("DGS"). DCPS must pay for some—but not all—of these services out of its annual operating budget (*e.g.*, through a memorandum of understanding or intra-District transfer). JA 842 at ¶ III.a., 852-53 ¶¶ 3-7. DCPS also staffs its own custodial teams at its schools to perform "Level 1" maintenance services, such as basic electrical, plumbing, and painting tasks. JA 853 ¶¶ 4-6.

Public charter schools do not receive facilities services from DGS; however, as noted, they receive an annual facilities allowance of approximately $3000 per student. D.C. Code § 38-2908(b-1), (b-2) (2016 Supp.). The allowance is calculated based on the charter school's annual projected enrollment, is disbursed as a lump sum with the first quarter formula payment, and is not subject to adjustment based on confirmed enrollment. *Id.* § 38-2908(b-1).

## 4.    The Instant Suit.

In July 2014, the Charter Schools filed suit for injunctive relief, claiming that the District was violating the School Reform Act to the extent it authorized DCPS to receive any funding outside of the formula. JA 22-30, 38-39 ¶¶ 38-62, 90-92. In addition, the Charter Schools specifically took issue with the services DGS provided

to DCPS and the District's payments into DCPS's Teachers' Retirement Fund, claiming that funding for these items also had to go through the formula. JA 27-29, 38-39 at ¶¶ 52, 54-55, 59, 90-92. The Charter Schools further alleged that the District was unlawfully using projected enrollment numbers to determine the formula payments for DCPS. JA 23-25, 38-39 ¶¶ 30-37, 90-92. The Charter Schools also contended that, under the Home Rule Act, once Congress legislates for the District, the District lacks authority to enact conflicting legislation. JA 34-35 ¶ 81-84.[10]

The District moved to dismiss the complaint for having failed to state a claim under the Home Rule Act, arguing that the Act permitted it to amend acts of Congress with an exclusively local effect, such as the SRA. The district court denied the motion without fully resolving the question, finding instead that the Charter Schools had alleged facts that, if true, raised more than a speculative right to relief. JA 139.

Both parties later moved for summary judgment, and the court granted the District's motion. JA 1005. The court rejected the Charter Schools' "quite narrow" interpretation of the School Reform Act as requiring all funds to be distributed

---

[10] The Charter Schools additionally included a claim under the Supremacy Clause of the Constitution, JA 36 at ¶¶ 87-88, *see* U.S. Const. art. VI, cl. 2, but it was dismissed by the trial court due to the Home Rule Act count. JA 144-45. The Charter Schools have not challenged that ruling.

according to the formula, finding that it wrongly imputed to Congress an intent to enact "a rather extreme restriction of the District's ability to manage its budget process with respect to . . . educational spending." JA 1013. Rather, the court agreed with the District that the formula was only to provide a "baseline per pupil budget." JA 1013-14.

Regarding DGS's services for DCPS properties, the court found that the District was properly including only the day-to-day maintenance of its facilities as "operating expenses" covered by the funding formula. JA 1017-18. The court reasoned that subtitle E of the School Reform Act reflected Congress's expectation that all other facilities costs were to be covered outside of the formula payment. JA 1017-18. With respect to retirement payments, the court reasoned that Congress had not intended to alter the long-standing practice of funding the retirement plan through separate appropriations from the District's General Fund and, accordingly, the retirement costs were not "normally incurred" by DCPS. JA 1018-19.

In addition, the court held that the Charter Schools lacked standing to challenge the District's methodology for calculating student enrollment in DCPS. The court found that the Charter Schools had not suffered a concrete injury because they did not allege that charter schools were underfunded as a result of enrollment calculations, or that a change in the District's methodology would result in additional funds being paid to charter schools. JA 1024, 1026.

Finally, having found that the District did not violate the School Reform Act, the court found it unnecessary to resolve the Home Rule Act claim.  JA 1026-27.

## STANDARD OF REVIEW

This Court reviews an award of summary judgment de novo.  *Deepenbrook v. Pension Benefit Guar. Corp.*, 778 F.3d 166, 171 (D.C. Cir. 2015).

## SUMMARY OF ARGUMENT

The district court properly granted the District summary judgment.

*First*, the School Reform Act allows the District to make expenditures targeting specific DCPS needs that arise after a fiscal year begins.  The text of the Act requires the funding formula to be used only for "annual" budget allocations covering operating expenses.  That is consistent with the legislative history, which demonstrates that the formula, though uniform across each system, was established to give a predictable operating baseline budget to each.  The Charter Schools misread the goals of Congress when they claim that the Act requires parity in all funding between the two systems, and indeed, the Charter Schools' interpretation produces absurd results that Congress could not have intended.  If an exigency in either system warrants more funding, either the schools' needs would have to go unaddressed, or more funds would have to be budgeted to meet it, providing a windfall to the other system.  Nothing in the School Reform Act precludes supplemental appropriations,

23

and all supplemental expenditures have gone through the congressional review process without objection.

*Second*, the text and structure of the School Reform Act confirm that facilities expenses and retirement funds were not considered annual operating expenses to be paid from the funding formula. To begin, Congress's treatment of repair and management of DCPS facilities in a separate subtitle of the School Reform Act contradicts any claim that funds allocated to DGS for those purposes must be made available to charter schools. Congress set forth demands focused solely on the ailing physical stock of DCPS, requiring the District to identify a local agency with separate funding to address DCPS's problems. Moreover, Congress addressed charter school facilities separately the next year by requiring a facilities payment directly to them, to be made outside the formula. Utilities and day-to-day custodial services were all that Congress expected to be a part of the formula for operating expenses of either system. This is evident by the fact that Congress has consistently appropriated the requested DGS funds for DCPS school repair, as itemized by the District in its Budget Plans.

Congress also did not contemplate that retirement benefits would be considered operating expenses covered under the formula. At the time the School Reform Act was passed, existing law called for DCPS teachers' retirement payments to be made directly from the District's General Fund to the Teachers' Retirement

24

Fund. Nothing in the School Reform Act suggests that Congress was impliedly repealing portions of the District's existing retirement regime. Indeed, the fact that charter schools were given the option of adopting their own retirement plans—or of declining to pay retirement benefits—suggests that Congress had a different scheme in mind. Tellingly, Congress has continued to appropriate teacher retirement benefits outside of DCPS's operating budget since the funding formula became effective.

The Charter Schools claim that these expenditures must be considered "operating expenses," but that is not supportable. Congress left the term "operating expenses" undefined, despite enacting an otherwise comprehensive definitional section in the School Reform Act. At the same time, Congress left it to the District to calculate the per-student cost foundation and otherwise collaborated with the District in the school reform effort. Congress thus left the District with discretion to fill in the details of what constitutes an operating expense for purposes of the formula.

*Third*, the Charter Schools' contention regarding the District's calculation of enrollment also fails. At the outset, the Charter Schools lack standing to challenge the District's use of projected DCPS enrollment to determine its formula payments. They concede that the District is properly calculating their own enrollment figures, which means they have not suffered a concrete injury. Even assuming that the

competitor-standing doctrine applies, it is not obvious that charter schools suffer competitive harm simply because DCPS might receive excess funds in a given year if its projections over-estimate enrollment, especially considering that DCPS may not carry excess funds over to the next fiscal year. In any event, the enrollment-calculation claim fails on the merits. The School Reform Act clearly treats charter schools differently than DCPS. The Act requires adjusted payments based on corrected enrollment numbers only as to charter schools, but not as to DCPS.

*Fourth*, although the District has not run afoul of the School Reform Act and thus the Court need not reach the question, the Home Rule Act permits the District to amend or repeal congressional legislation that applies exclusively to the District, unless Congress has prohibited such amendment. The Charter Schools' claim that the District may amend only pre-Home Rule Act legislation finds no place in the text of the statute and is flatly inconsistent with Congress's express purpose in granting the District Home Rule.

## ARGUMENT

### I.    The District's Education Spending Is Consistent With The School Reform Act.

#### A.    The funding formula does not apply to expenditures for specific needs arising outside of the annual budget allocation.

The Charter Schools argue that the School Reform Act's funding formula is the "exclusive" method through which all of the District's educational expenditures must pass. Br. 26-27. That is contrary to the text of the School Reform Act and

26

congressional intent. It would also be unworkable in practice, for charter schools and DCPS alike.

The Charter Schools' theory fails from a strictly textual standpoint because it reads the term "annual" out of the statute. Br. 26-29. Section 2401 of the School Reform Act directs the Mayor to make "*annual* payments . . . in accordance with the formula." SRA § 2401(a) (emphasis added). It also directs the Mayor and the Council to devise the formula so as to determine "the amount of . . . the *annual* payment to [DCPS]" and "the *annual* payment to each public charter school." SRA § 2401(b)(1)(A)-(B) (emphases added). Congress's use of the term "annual" indicates that it intended the formula payments to be made once a year at the time of the budget allocation that coincides with the District's appropriation process, regardless of how that payment is later distributed logistically. To argue that the funding formula applies to any payment occurring outside the annual allocation is to read "annual" out of the statutory language.

This does not mean Congress did not view the annual payment as a bedrock effort to meet the educational needs of students, and, indeed, it accounts for the lion's share of school funding. The Council first legislated the requirement for a funding formula tied to the costs of educating students to provide a baseline predictable budget for long-term planning:

> A funding formula has long been desired by public school advocates, members of the Board of Education, and the Superintendent of Schools,

27

> all of whom have contended that some predictability in forthcoming appropriations would allow the school system (and public charter schools) to engage in substantive long-range planning and develop multi-year budgets, both of which are essential to achieving over a specified period of time education reform goals, particularly widespread improvements in student achievement.

Council Comm. Rep. at 15. Congress incorporated the Council's legislative language and in doing so remarked that the formula "will be used to provide "operating budgets" for both educational sectors. H.R. Rep. No. 104-455 at 146. As the record reflects, the annual budget allocation under the formula has accounted for "most of [each sector's] resources from local funds," which in Fiscal Year 2014 totaled approximately $1.3 billion dollars. JA 787.

By any definition, the annual baseline budget allocation under the formula is a prediction of the educational costs both systems will incur. It cannot account for unexpected exigencies that arise in only one sector requiring additional targeted expenditures, of which examples are legion—as Congress no doubt understood. Schools might face a loss of federal or private sector grant monies; a contractor providing services to either DCPS or a charter school might go bankrupt, leaving schools to fend for themselves; or an entire school might need to relocate due to unexpected asbestos remediation or another unforeseen emergency.

Expecting emergencies of this sort to be addressed through a fund for annual operating expenses makes little sense. It would require the District to appropriate an amount decidedly more than needed to ensure that schools could address

28

exigencies.  And an award of those monies pursuant to the formula would result in the other sector, which does not face the same exigency, receiving a windfall in matching funds that is entirely unmoored from student need. [11]  This would be the case even if a particular exigency was arising in a school at the time of calculating the annual budget allocation.

Historical context underscores the statute's plain meaning.  When Congress passed the School Reform Act, it had just installed a Control Board within the District government to rein in spending.  *See* District of Columbia Financial Responsibility and Management Assistance Act of 1995 ("FRMAA"), Pub. L. 104-8, 109 Stat. 97.  Congress also limited the number of charters that could be granted each year to forestall what the Council believed could be a dramatic increase in educational spending should, for example, private schools and their student populations suddenly petition to become charter schools.  SRA § 2203(i); Council Comm. Rep. at 36.  The Congress that passed the School Reform Act could not be thought to have then turned around to require education dollars to be spent so loosely on non-annual expenditures, with a gratuitous payment to the sector not facing the expense.

---

[11]     Indeed, the Charter Schools fail to explain how processing spending through the formula would work if an issue arises in only one or a small number of DCPS schools, since Congress required the formula to involve a foundation number multiplied by enrollment in the entire system.

29

The Charter Schools contend that Congress's use of the term "uniform" in the formula manifested its intent to put charter schools on equal footing regarding *any* dollars spent by the District on public education. Br. 3, 11, 13, 27, 31. But here again, the Charter Schools ignore that the funding formula is an *annual* budget allocation for "operating expenses" that does not apply outside of those payments. The District does not dispute that, for most ordinary expenditures, there is an equality principle embedded in the formula; indeed, it was designed as a way for funding to follow the student. The "uniform" foundation amount therefore ensures that publicly financed charter schools will receive public dollars to cover the costs of educating their students in the same way as DCPS. But the Charter Schools put too much stock in the term "uniform" to the extent they suggest that it means there must be parity in funding for both systems, whatever the timing or nature of the expenditure. Br. 11.

The Charter Schools also highlight Congress's concern about a "two-tiered system of public schools," Br. 11, 33, but fail to mention the context: namely, the fear that *DCPS* would suffer when its students (and public funds) went to charter schools. Council Comm. Rep. at 8, 42; *see* 141 Cong. Rec. H11721. Congress believed that this concern would be allayed by the fact that charter schools would have incentives, based on weighting factors, to create programs focusing on students with special needs. 141 Cong. Rec. H11721. This specific concern was not a

30

precursor to some notion of absolute funding parity between what are otherwise distinct systems with unique needs.[12]

The Charter Schools fare no better by claiming that Congress outlined only limited exceptions to the formula, with respect to funding for different grade levels and for students with special needs. Br. 12, 30. As an initial matter, these subjects are not "exceptions" to the formula, as Congress expected that the increase in the costs of educating students in different grades and with special needs would be factored into the formula as weighting factors to the foundation amount. H.R. Rep. No. 104-455, at 146 ("The formula may take into account such variations for students at different grade levels and students with special needs."). In any event, these "exceptions" speak only to student characteristics, not to the periodic needs of one or the other school system outside the annual budget.

The Charter Schools also cannot find solace in Congress's use of "shall" in the mandate for the District to create and use the formula. Br. 28. The School Reform Act simply directs that the District *must* make annual budget allocations for operating expenses using the formula. It says nothing about funding outside the annual process. And the fact that Congress meant for the annual budget to meet all

---

[12]      The Charter Schools contend that Congress was influenced by testimony from the former head of the Board of Education in a congressional hearing, Br. 9-10, but this hearing post-dated the School Reform Act. 1996 WL 353916 (June 27, 1996).

annual operating expenses in no way precludes the District from addressing any unanticipated and non-recurring needs of either system outside of the annual budget.

Finally, if Congress disapproved of how the District has been handling supplemental education expenditures, it could easily have vetoed them at some point in the last decade—but it has not. Congress, for example, did not veto the near $25 million in supplemental funding for DCPS for Fiscal Year 2012 when it went through the congressional review process, even though the Council stated that the allocations "create[d] [no] obligation to provide additional funding to any local education agency except [DCPS]." Fiscal Year 2012 Second Revised Budget Request Temporary Adjustment Act of 2012, § 2, D.C. Act 19-396, 59 D.C. Reg. 8705 (July 27, 2012). The Charter Schools claim Congress's acquiescence means nothing because "Congress speaks through legislation." Br. 53. But, as this Court has noted, Congress set up its bicameral veto authority as a "critical" means of oversight of the District's actions. *Bliley v. Kelly*, 23 F.3d 507, 513 (D.C. Cir. 1994). Indeed, the Court has viewed the lack of a veto as an act of congressional approval. *Id*. at 510. Thus, congressional "inaction" when it comes to District legislation under the Home Rule Act is not the same as its inaction in other contexts. *See, e.g.*, *Girouard v. United States*, 328 U.S. 61, 69 (1946) (involving lack of congressional amendment of a naturalization statute); *Cent. Bank of Denver, N.A. v. First Interstate*

*Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994) (referring to the varying inferences that can be drawn from Congress's failure to adopt bills amending a statute).

In short, based on text and context, Congress did not intend the School Reform Act to regulate expenditures outside of the annual budget allocation.

## B.    Congress intended for facilities assistance, as well as retirement benefits, to be treated separately from the funding formula.

### 1.    Congress specifically addressed facilities expenses outside of subtitle D.

The Charter Schools argue they should get a cut of the spending by DGS for various facilities-related services it provides to DCPS by factoring those monies into the funding formula.  Br. 14-16, 37-38.  As an initial matter, the Charter Schools misread the annual budget documents to overstate what DGS is providing.  For example, the Charter Schools read the "Agency Management" functions in the DGS Budget Plans as evidently referring to DCPS as the agency being managed by DGS when it refers to public education.  Br. 15-16; *see e.g.* JA 303-04.  But "Agency Management" refers to funding categories for operations within DGS.  JA 303; D.C. Code § 10-551.02(1) (referring to an agency management function within DGS to include the staff and organizational units DGS needs to carry out its overall plan and direction).[13]  And the "realty" services the Charter Schools reference involve DGS

---

[13]    The Charter Schools claim that the District admitted that these expenditures were made by DGS for DCPS, Br. 16, but the District's admission was limited only

allowing access and utilization of school grounds *to other entities* with use agreements or leases, not to the operation of school grounds for educational purposes. *See, e.g.*, JA343. The expenditures the Charter Schools challenge are thus inflated.

That said, DGS does provide DCPS with repairs, improvements, and maintenance of facilities other than "Level 1" maintenance. JA 852-53 ¶¶ 3-7. It also handles capital improvements and construction services. JA 789-90, 800-01. DCPS funds the "Level 1" expenses, including but not limited to custodial services and minor repairs. JA 853 ¶ 5. DCPS also reimburses DGS for utilities. JA 676, 793, 842 ¶ III.a, 846.

But Congress never expected the services provided by DGS to be paid through formula funds. A critical piece of Congress's reform efforts was prodding the District to renovate and upgrade school buildings that had fallen into disrepair. H.R. Rep. No. 104-455, at 147 (noting that 62% of the District's public schools were over 45 years-old but only eight schools ever had renovations); 141 Cong. Rec. 11722 ("Subtitle [E] . . . begins to address the facilities problems that plague [DCPS]. It is appalling that the schools of our Nation's Capital have had to be closed . . . because they were deemed unsafe.").

---

to those services identified by the Deputy Director of Facilities for DGS in his declaration attached to the District's cross-motion for summary judgment. JA 547-48 ¶ 46.

34

Thus, separate from the provisions on charter schools and formula funding, Congress enacted Subtitle E in the School Reform Act for "School Facilities Repair and Improvement." SRA § 2551(a), (b). Those provisions initially enlisted the federal GSA to assist DCPS with "facilities management" issues, which included construction, renovations, and administration. *Id.* Congress then directed the District to identify a municipal agency to take over the "repair[s]," "improvement[s]," "maintenance," and "management" of DCPS facilities, as well as to identify funding for those functions, such as by selling or leasing school buildings. *Id.* § 2552. Despite Subtitle D, Congress did not say that this funding would come out of the operating budget for DCPS. Congress clearly was not treating the improvement and management of DCPS facilities as "operating expenses" covered by Subtitle D. Indeed, only a year later, Congress added a provision to the School Reform Act, under the heading "[a]djustment for facilities costs," that required the District to increase the annual payment for charter schools to take account of their costs in leasing and improving real property—separate from the calculation of ordinary Subtitle D operating expenses. D.C. Appropriations, Fiscal

Year 1998, § 171.  Those payments were expressly calculated outside the funding formula.  *Id.*[14]

In claiming that DGS's expenses should be included in the funding formula, the Charter Schools rely on a House committee report prepared as part of the Fiscal Year 1997 appropriations for the District, after the School Reform Act was passed, in which members remarked that the formula payments must cover "all facilities operating costs, including utilities" as well as "any other direct or indirect costs normally incurred by, or allocated to" DCPS.  Br. 12, 32, 37; H.R. Rep. No. 104-689 (1996), 1996 WL 413198 at *50.  As an initial matter, "[w]hat Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators."  *Nat'l Labor Relations Bd. v. SW General, Inc.*, 137 S. Ct. 929, 943 (2017).  Despite these isolated comments in the committee report, Congress did not amend the School Reform Act to define or redefine "operating expenses" when it passed the final version of the appropriations act that year.  D.C. Appropriations Act, 1997, Pub. L. 104-194, 110 Stat. 2356.

---

[14]    As noted, this resulted in the District enacting a facilities allowance for charter schools that in Fiscal Year 2016 was $3,072 per student.  D.C. Code § 38-2908(b-2)(1) (2016 Supp.).  In light of that allowance, the Charter Schools' calculation of purported per-student funding to DCPS that was higher than the charter schools' funding is incorrect.  Br. 16.

In any event, the language in the committee report is actually consistent with the funding practices challenged by the Charter Schools. "Operating costs" of facilities that are "normally incurred" by DCPS under any reasonable view would be those that keep a school running from day to day: *e.g.*, the "utilities" the committee report references as an example. DCPS not only pays for those, it also covers custodial services like keeping the bathrooms running or replacing air filters on air-conditioning units. JA 853 ¶¶ 4-6. Those expenses were and are "normally incurred" by DCPS—whereas maintaining District property more broadly, given the language of Subtitle E, was not.

Indeed, excluding more significant maintenance and repairs from the funding formula makes sense in light of the systemic differences between DCPS and charter schools. As a "system of right" that must permit enrollment by any student within a neighborhood boundary at any time, the District must maintain school buildings across the city, many of which DCPS does not fully utilize, or, as Congress described, are older and not configured for efficient or modern use of educational space. JA 657-58, 667; H.R. Rep. No. 104-455, at 147. Public charter schools, on the other hand, may set enrollment ceilings, can refuse to accept students beyond their stated capacities, and have more flexibility in selecting or leasing facilities. JA 657; *see* JA 658 ("Traditional DC public schools operate in buildings owned by the DC government").

What is more, DGS's budget is submitted annually to Congress for its approval of the District's local fund appropriations, and Congress's consistent approval indicates its approval of the District's view of facilities funding. *See, e.g.*, Fiscal Year 2013 Operating Budget Chapters and Operating Appendix Tables and Capital Budgets by Agency, https://cfo.dc.gov/sites/default/files/dc/ sites/ocfo/publication/attachments/ocfo_fy2013_volume_2_chapters_part_1.pdf (last visited Sept. 6, 2018); JA 237, 827 ¶ 11; *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 19 n.7 (D.C. Cir. 2006) (holding that a line item in a budget request may support ratification through an appropriation).

The Charter Schools argue that Congress's budget approval matters only if the District can show that Congress had precise knowledge of the DGS budget allocations for DCPS schools, and they make the remarkable claim that Congress would not review "funding inequities . . . buried in line items" of the proposed budget.  Appellant Br. 54.  But they offer no support for the notion that Congress would ignore these critical break-outs of the District budget, especially when, in the Home Rule Act, Congress required itself to approve the District's budget.  Indeed, in the House committee report frequently relied on by the Charter Schools, members expressed their dissatisfaction with the District's then-general budget request for its agencies, complaining in one instance that "the budget documents provide no descriptive or analytical information on how the additional funds [for the

38

Department of Corrections] above the base budget will be used on a programmatic basis." H.R. Rep. No. 104-689, 1996 WL 413198 at *10-11. And, in one instance, the House Committee on Appropriations deleted from the District's budget a specific proposal to pay negotiated salary increases for DCPS teachers outside the funding formula (while asking for federal funds to accommodate a similar increase for charter schools). H.R. Rep. No. 108-214, at 24 (2003). As past practice indicates, Congress is well aware of the Budget Plan specifics the District provides. *See also* Omnibus Appropriations Act, 2009, Pub. L. 111-8, 123 Stat. 524, 655 (expressly incorporating the District's Budget Plan).

> 2.   The School Reform Act did not repeal existing laws on retirement benefits for teachers, or even require charter schools to have a retirement plan.

When the School Reform Act was passed, retirement benefits for teachers were not part of the operating budget for DCPS, but instead were allocated from the District's General Fund directly to the D.C. Retirement Board, in accordance with the Retirement Act. *See* Retirement Act § 144. The Charter Schools' contention that retirement benefits were nonetheless required to be funded by the formula, Br. 16-17, is belied by this historical practice. Their argument also requires the Court to conclude that Congress was impliedly repealing provisions of the Retirement Act, but "[i]mplied repeals are disfavored and not presumed unless the legislative intent

39

is clear and manifest," *Megginson v. Pritzker*, 775 F.3d 430, 437 (D.C. Cir. 2015), a standard that is not even remotely met here.

To begin, Congress made clear in the School Reform Act that a retirement plan for charter school teachers—unlike the plan for DCPS employees—was optional, and it specified that charter school teachers were not government employees who would automatically receive government benefits. SRA § 2207(b)(2)(c).[15] It thus makes sense that retirement expenses for DCPS and charter schools would be treated and funded differently. Were retirement monies for DCPS teachers part of the funding formula, charter schools that chose not to adopt a retirement plan, or those that funded a retirement plan outside of their budget allocation, would receive a sizeable windfall of excess funds. Certainly, if Congress expected the formula to take account of retirement benefits, it would have *required* charter schools to provide those benefits out of their operating expenses.

Moreover, Congress authorized DCPS teachers who chose to permanently move to the charter school system the option to stay in the Teachers' Retirement Fund, which Congress separately defined in the School Reform Act to be the system that Congress had previously set up. SRA § 2207(b)(3); *see id*. at § 2002(11). If

---

[15]    There is no requirement that electing charter schools fund a retirement program out of their budget allocation. School Reform Act § 2207(b)(2).

Congress had intended to change how that plan was funded, so as to require monies to come out of DCPS's operating budget, it had ample opportunity to do so.

Funding retirement benefits outside the formula is also consistent with the legislative history of the School Reform Act. As noted, the School Reform Act was modeled on the Council's own school reform legislation. *See* H.R. Rep. No. 104-455, at 143. When it came to retirement benefits, the Council believed that funding such benefits outside the formula would prevent a major increase in public education spending by providing a disincentive for private schools to convert to charter schools. *See* Council Comm. Rep. at 36. The Council also thought that charter schools, which are outside the District's bureaucracy, would be more cost-effective and therefore able to handle separate retirement benefit payments. *Id*. Congress followed the Council's lead in making it optional for charter schools to create their own retirement system. *See* Council Comm. Rep. at 22 (Committee Print).

If all this were not enough, the subsequent appropriations acts confirm that Congress did not intend to change funding for retirement plans. In the years after passage of the School Reform Act, including the first appropriations act using the funding formula, Congress funded a line item for DCPS teachers' retirement benefits out of the District's local funds separate from both DCPS's and the charter schools' operating expenses. *See* D.C. Appropriations Act, 1997 110 Stat. 2356 (listing "$88,100,000 from local funds for the District of Columbia Teachers' Retirement

41

Fund"); D.C. Appropriations, Fiscal Year 1998, 111 Stat. 2164; Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. 105-277, 112 Stat. 2681; D.C. Appropriations Act, 2001, Pub. L. No. 106-522, 114 Stat. 2449.[16]    It is indisputable that Congress knew that the District was allocating retirement benefits outside of the School Reform Act's formula payments, and its "repeated appropriations . . . confirm[] the [District]'s construction of the [Act]." *Brooks v. Dewar*, 313 U.S. 354, 361 (1941).

### C.   Congress ultimately left the District with discretion to determine the educational costs that are "operating expenses" covered by the formula.

Even apart from Congress having treated facilities costs and retirement benefits separate from the funding formula, the text and legislative history of the School Reform Act demonstrate that Congress left the District with discretion to determine what costs "operating expenses" would encompass.

Congress enacted a comprehensive definitional section in the School Reform Act, but conspicuously left the term "operating expenses" undefined.  SRA § 2002. Even after members of a later House appropriations committee offered their gloss

---

[16]    The House committee report relied on by the Charter Schools to define "operating expenses" approved an appropriations bill for fiscal year 1997 that also listed retirement benefits as a line item separate from operating expenses.  H.R. Rep. No. 104-689 (1996), 1996 WL 413198, at *52.  Indeed, as the district court noted, the committee's definition of operating expenses as those "normally incurred" by the Board of Education would not include retirement benefits historically provided out of the District's General Funds and not DCPS's budget.  JA 1018-19.

on the term, Congress elected to leave it undefined.  In other contexts—for example, when Congress tasks an administrative agency with implementing a statute—the lack of a definition is "an implicit delegation of authority to the agency to elucidate a specific provision of the statute through reasonable interpretation." *Grand Canyon Airtour Coal. v. FAA*, 154 F.3d 455 (474 (D.C. Cir. 1998) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 843-44 (1984)).  To be sure, the District is not a federal agency, but the analogy of congressional-agency relations is apt, not for claiming *Chevron* deference, but rather for the basic idea that Congress will delegate legislative power in an expert area (here the District's local affairs) that the Congress does not wish to micromanage.  *Chevron*, 467 U.S. at 843-44.  Similarly, it is not unusual for Congress to set broad standards for States to tailor based on local conditions.  *See Wis. Dep't of Health and Family Servs. v. Blumer*, 534 U.S. 473, 495 (2002) (noting that federal statutes structed to advance cooperative federalism, like the Medicaid statute, may provide a range of permissible choices to the States in their implementation); *Dandridge v. Williams*, 390 U.S. 471, 478 (1970) (noting States' "considerable latitude" in allocating resources under federal scheme).

That some matters were left to the District's discretion is even more evident from the fact that, as even the Charter Schools concede, the School Reform Act was not a top-down legislative effort by Congress.  Br. 7-8.  Congress worked with the District for a year to design a "structure" for education reform that the District could

43

build upon.  H.R. Rep. No. 104-155, at 141-42.  Indeed, although the School Reform Act required the District to establish a formula for annual payments, it allowed the District to determine the foundation amount (and weightings) that would represent the costs of educating students.  *See* SRA § 2401(b)(1), (2).  The fact that "operating expenses" was left without definition in the context of this collaborative approach indicates that Congress intended the District to reasonably interpret "operating expenses" in the School Reform Act, particularly considering that "[n]o single tradition in public education is more deeply rooted than local control of the operation of schools."  *Martinez v. Bynum*, 461 U.S. 321, 329 (1983).

The Charter Schools regard the lack of a definition of "operating expenses" as irrelevant.  They argue that "operating expenses" has a widely agreed upon meaning which would encompass, among other things, facilities costs and retirement benefits.  Br. 35-36.  The cases and dictionary definitions they cite, however, are inapposite.  For example, the Charter Schools contend that the Court held in *Louisiana Public Service Commission v. FCC*, 476 U.S. 355 (1986), that the phrase "operating expenses" is a technical term of art and should be construed accordingly.  Br. 35.  But the Court there was not defining the term "operating expenses"; it was instead looking at other accounting terms, such as "depreciation."  476 U.S. at 372.

In addition, the public education cases the Charter Schools cite (at 36 n.2) are largely limited to the facts or circumstances those cases were addressing.  *See, e.g.*,

*Levenstein v. Salafsky*, 414 F.3d 767, 769 (7th Cir. 2005) (referring to a dispute about a fund at a medical school designed to cover school operating expenses); *Renaissance Acad. for Math and Sci. of Mo., Inc. v. Imagine Schs., Inc.*, 2014 WL 3828558 at \*5 (W.D. Miss. Aug. 2, 2014) (referring to a contract for a management company to operate a charter school that required the company to regularly pay certain operating expenses); *Long v. Franklin Cmty. Sch. Corp.*, 2010 WL 3781350 at \*4 (S.D. Ind. Sept. 21, 2010) (referring to a fund the State of Indiana required each local school corporation to establish as a primary source for paying most operating expenses); *Thomas Jefferson Classical Acad. Charter Sch. v. Cleveland Cty. Bd. Of Educ.*, 778 S.E.2d 295, 301 (N.C. Ct. App. 2015) (referring to finding by trial court that school system had used funds for its general operating expenses); *cf. Berkeley Cty. Sch. Dist. v. S.C. Dep't of Revenue*, 679 S.E.2d 913, 919 (S.C. 2009) (finding that a tax exemption for monies spent on "school operating purposes" applied to financing arrangements by school district for facilities acquisition and renovation).

More importantly, each of these cases embraces a different definition of "operating expenses," resulting in varying permutations that might or might not include items such as retirement benefits or more than day-to-day management of facilities. This shows that the phrase "operating expenses" is ambiguous—or, at the very least, flexible as to the items at issue.

45

Finally, in addition to the fact that Congress has approved the District's DGS and retirement fund appropriations from year to year, the Council stated clearly in the UPSFF Act that "[t]he formula shall apply *only* to operating budget appropriations from the District of Columbia General Fund for DCPS and for Public Charter Schools," D.C. Code § 38-2902(b) (emphasis added), and therefore not to funds within DGS's budget or payments going directly from the District's General Fund to the Teachers' Retirement Fund. Were more needed, the UPSFF Act further provided that the formula "shall not apply to . . . funds appropriated to other agencies," such as DGS. *Id.* The plain language in the UPSFF Act successfully survived congressional review, indicating a lack of disagreement from Congress.

## II. The Charter Schools Lack Standing To Challenge The District's Methodology For Calculating Enrollment And, In Any Event, It Comports With The School Reform Act.

### A. The Charter Schools lack standing to pursue their claim.

"The party invoking federal jurisdiction bears the burden of establishing the[] elements [of standing]." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The "irreducible constitutional minimum" for standing requires first that "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citations and internal quotation marks omitted). It must also be "likely" that the claimed injury will be "redressed by a

favorable decision," not "speculative."  *Id*. at 561 (internal quotation marks omitted).

At the summary judgment stage, plaintiffs "must set forth by affidavit or other

evidence specific facts" showing that they have standing to bring their claim.  *Id*.

The Charter Schools failed to meet their burden, as the district court correctly

held.  They do not claim that the method by which enrollment is calculated for

charter schools is unlawful or results in a lower amount of formula payments than

that to which they are entitled.  To the contrary, their claim is that the District must

apply the methodology used to calculate charter school enrollment to *DCPS* because

doing so would conform to their view that the School Reform Act requires

enrollment to be based on audited numbers for both systems.  JA 184-185, 197; Br.

55-58.  The Charter Schools have thus suffered no concrete injury, since any change

in methodology would not result additional funds flowing to charter schools.

To the extent they allege competitive harm, the Charter Schools fail to point

to any evidence in the record showing that they are harmed simply because DCPS

might have projected enrollment too high in a given year.  In fact, they decline to

confront the District's exhibit showing that enrollment after October 1, including the

enrollment of special education students, *increases* in DCPS and declines in charter

schools.

What is more, even assuming that the competitor-standing doctrine applies to

a dispute between two expressly not-for-profit instrumentalities of the same

47

government, any allegation of competitive harm—that is, that a student would chose DCPS over a charter school based on the incidental effect of the District's enrollment calculations on formula funding—is purely speculative.  Indeed, in passing the School Reform Act, Congress was concerned that DCPS had one of the highest per-pupil expenditures but poor results.  H.R. Rep. No. 104-455, at 146.  And the Charter Schools point to no evidence in the record to show that students (or their parents) prefer DCPS over charter schools for reasons that could be ascribed to funding based on incorrect enrollment projections.[17]  In fact, as of 2013, public charter schools educated "nearly half of the public school population," showing a preference in the opposite direction.  JA 566.  The Charter Schools argue that it is obvious that any funding imbalance hinders the ability of charter schools to retain teachers, Br. 60, but they did not proffer the affidavit of even one teacher who moved to DCPS on that basis.

This Court should affirm the district court's dismissal of the Charter Schools' enrollment-calculation claim.

---

[17]    Again, any excess payments the District receives in a given year cannot just be retained for future spending due to the federal and local Anti-Deficiency Acts. D.C. Code §§ 1-204.46, 47-355.02.

**B.    The School Reform Act permits the District's dual methodology for calculating enrollment.**

If this Court reaches the merits—and it should not—the School Reform Act permits the District's methodology for calculating enrollment.  The Act requires only that DCPS enrollment be calculated "no later than October 15."  SRA § 2402(b).  There is no legislative history illuminating Congress's choice to put only an outer time limit on the calculation, although it came from the Council's bill, Council Comm. Rep. at 35 (Committee Print), but it almost certainly was in recognition of the fact that the District had to pass a budget and then forward an appropriation request to Congress for approval well before the school year begins in order to spend local funds for public education.  D.C. Code §§ 1-204.42, 204.46 (appropriations request to Congress cannot be submitted until Mayor proposes and the Council adopts a budget, and no expenditures are permitted unless approved by Congress).  The District's use of projected numbers accounted for that legislative reality.  While the Charter Schools point to the phrase "that are enrolled" with respect to the calculation requirement as an indicator that the District must use "actual" figures, that construction is untenable when the District must pass and submit a fiscal year budget request to Congress before the school year begins.

The Charter Schools' contentions also are belied by the fact that Congress required an audit of the District's calculation that is to be made public, and which is to include the identification of "any material weaknesses in the systems, procedures,

49

or methodology used" to determine the number students enrolled. SRA § 2402(d)(2)((B)(i). This language makes little sense if all Congress expected was that DCPS would conduct a head count within a month of the school year beginning; rather, the language is more applicable to a broader evaluation of the predictive models DCPS uses to estimate its student body prior to the beginning of a school year.

More to the point, Congress did not require DCPS to adjust its payment based on the audit. This, of course, is in contrast to the express language Congress used regarding charter schools, where the School Reform Act requires that the formula payments be adjusted up or down based on actual numbers. *Id.* § 2403(2)(B). To require such an adjustment for DCPS would write language into the School Reform Act that Congress declined to include. Congress simply mandated a different methodology for determining enrollment in each system.

## III. The Home Rule Act Allows The District To Amend Federal Law Enacted Exclusively To Govern It, Unless Congress Says Otherwise.

While the District has not run afoul of the School Reform Act, even if it had, the District may, consistent with the Home Rule Act, amend or repeal a federal law that applies exclusively to the District. Specifically, Section 302 of the Home Rule Act directs that, "[e]xcept as provided in sections 601, 602 and 603, the legislative power of the District shall extend to all rightful subjects of legislation." HRA

§ 302.[18]  Section 602, which is entitled "Limitations On The Council," states, in pertinent part, that "[t]he Council shall have no authority to . . . enact any act to amend or repeal any Act of Congress . . . which is not restricted in its application exclusively in or to the District."  HRA § 602(a)(3).  A straightforward reading of these two provisions therefore permits the District to amend or even repeal laws, like the School Reform Act, that are restricted to the District.

Enabling the District to amend legislation governing local issues in no way abrogates Congress's authority with respect to the District, because Congress has three distinct means by which to prevent the District from doing so in a particular case.  First, if Congress intends *ex ante* to prevent the District from amending a law, it may simply say so in the statute, as it did when it created the Control Board to avert a financial crisis in the District.  FRMAA § 108(b)(2) (amending the Home Rule Act so as to prohibit the District from enacting "any act, resolution, or rule with respect to" the Control Board).  Next, because no act of the Council can become law until it has cleared congressional review, HRA § 602(c)(1), Congress may veto the Council's legislation.  *See e.g.* Pub. L. 102-11, 105 Stat. 33 (disapproving Council law on building heights).  Finally, because Congress "reserve[d] the right, at any time, to exercise its constitutional authority as legislature for the District by enacting

---

[18]     Section 404(a) vests this legislative power with the Council.  HRA § 404(a).

legislation on any subject . . . including legislation to amend or repeal any . . . any act passed by the Council," it may repeal the Council's action. HRA § 601; *see, e.g.*, D.C. Appropriations Act, 2001, § 143(b), 114 Stat. 2471 ("The Legalization of Marijuana for Medical Treatment Initiative of 1998 . . . shall not take effect").

Here, nothing in the School Reform Act remotely indicates that the District's Home Rule Act authority was being circumscribed as to education funding, nor has Congress vetoed or repealed any of the educational spending at issue or the portion of the District's UPSFF Act that authorizes DGS and retirement payments outside of the formula.

The Charter Schools argue that Section 602(a)(3) does not provide the District with any authority to modify District-focused legislation, but rather limits the District's power given its phrasing. Br. 52. But this Court held otherwise in *Kingman Park Civic Association v. Bowser*, 815 F.3d 36 (2016), where it relied on Section 602(a)(3) to uphold the District's repeal of an 1888 statute prohibiting overhead wires to enable its streetcar initiative. *Id*. at 40.

Nor is Section 602(a)(3) somehow limited by Section 717(b), which the Charter Schools contend allows the District to amend or repeal only pre-Home Rule Act congressional legislation.[19]  First, this interpretation does not conform to the

---

[19]    In pertinent part, Section 717(b) provides:

structure and sequencing of the Home Rule Act. The only limitations on the District's broad legislative prerogatives are in the sections entitled "Limitations on the Council," which are cross-referenced in both the affirmative delegation of power sections to the District and then the Council. HRA §§ 302, 404(a). Section 717(b) comes later and is not cross-referenced in the sections granting legislative power to the District, or even in the section on limitations of that power.

Second and relatedly, Section 717(b) had a specific focus on clarifying the impact of the new District government on the status quo. Thus, Congress reiterated that the District's territory remained the same, § 717(a), (c), its corporate status continued, § 717(a), and the laws in force before the Home Rule Act would remain so until otherwise amended or repealed "as authorized" in the Home Rule Act or by Congress. *Id.* § 717(b). The "as authorized" phrase was an obvious reference to the Council's power as clarified in Section 602(a)(3). It also defeats any claim that the more limited power of repeal referenced in Section 717(b) governs Section 602(a)(3). Congress was simply reiterating the Council's repeal powers in a more

---

> No law or regulation which is in force on the effective date of [the District Charter] shall be deemed amended or repealed by this Act except to the extent specifically provided herein or to the extent that such law or regulation is inconsistent with this Act, but any such law or regulation may be amended or repealed by act or resolution as authorized in this Act, or by Act of Congress.

HRA § 717(b).

53

specific section addressing issues relating to the succession of government. *See United States v. Hansen*, 772 F.2d 940, 946-47 (D.C. Cir. 1985) (noting that Congress sometimes enacts language as a reminder to the reader, or "to make assurance doubly sure").[20]

The Charter Schools' contention also fails because it conflicts with a central purpose of the Home Rule Act—to "relieve Congress of the burden of legislating upon essentially local District matters." HRA § 102(a). If the District were prohibited from amending post-Home Rule Act congressional enactments exclusively concerning the District, then only Congress could act to address the changing needs of District residents. And every time Congress passed a law concerning the District, the local matter would then fall back into its exclusive purview—the very problem the Home Rule Act was designed to correct. Congress could not have intended to so dismantle Home Rule every time it exercised its reserved authority to act on a District matter.

---

[20]    As the District noted below, the Council has amended and even repealed post HRA acts of Congress. Case 1:14-cv-01293-TSC, Document 27.

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

LOREN L. ALIKHAN
Solicitor General

CAROLINE S. VAN ZILE
Deputy Solicitor General

/s/ Jason Lederstein
JASON LEDERSTEIN
Assistant Attorney General
Bar Number 55722
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 630 South
Washington, D.C. 20001
(202) 724-5671
(202) 715-7724 (fax)
jason.lederstein@dc.gov

September 2018

## CERTIFICATE OF SERVICE

I certify that on September 7, 2018, electronic copies of this brief were served

through the Court's ECF system, to the following counsel:

Carol J. Nichols
Kelly P. Dunbar
Tomas C. Kost
Karin Dryhurst
Justin Baxenberg

Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006


/s/ Jason Lederstein
JASON LEDERSTEIN

## CERTIFICATE OF COMPLIANCE

I further certify that this brief complies with the type-volume limitation in

Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 12,969

words, excluding exempted parts.  This brief complies with the typeface and type

style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because

it has been prepared in a proportionally spaced typeface using Microsoft Word 2010

in Times New Roman 14 point.


/s/ Jason Lederstein
JASON LEDERSTEIN